# EXHIBIT A

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

**CROSSROADS EQUIPMENT LEASE AND FINANCE, LLC MASTER EQUIPMENT FINANCE AGREEMENT**

Borrower's Address: 9906 Bustleton Avenue G-11
Philadelphia, PA 19115
Borrower's State of Organization/Formation: **Pennsylvania**

THIS MASTER EQUIPMENT FINANCE AGREEMENT, dated as of **August 10, 2023** ("Master Agreement") is between the borrower above ("Borrower") and CROSSROADS EQUIPMENT LEASE AND FINANCE, LLC, with an address of 9385 Haven Ave., Rancho Cucamonga, CA 91730 ("Lender"). Certain definitions and rules of construction used in this Master Agreement are provided in Section 14.

**1. General Provisions; Security Interest**. This Master Agreement contains provisions under which Lender will from time to time provide financing for Borrower to purchase certain items of personal property (collectively, "Equipment" and individually, an "Item") described on each schedule incorporating the terms of this Master Agreement (each, a "Schedule"). Each Schedule will constitute a separate agreement and the term "Agreement" refers to a Schedule and this Master Agreement as incorporated therein. This Master Agreement is not a legal commitment to enter into any Schedule and, after executing a Schedule, Lender shall have no obligation to finance any Equipment until all conditions to funding are completed to the satisfaction of Lender. Each Agreement may be terminated or prepaid only if and as expressly provided therein. As security for Borrower's Obligations under each Agreement and all Other Agreements, Borrower grants to Lender a first priority security interest in: (a) all of the Equipment financed pursuant to each Schedule and all accessories, parts, attachments, improvements, accessions, replacements, substitutions, additions and proceeds (including any insurance proceeds) thereof; (b) all Accounts, Chattel Paper, Payment Intangibles, leases, subleases, security deposits or other cash deposits and proceeds relating to any Equipment financed pursuant to each Schedule (without in any way limiting the restrictions set forth in Section 8); and (c) all other collateral as to which a security interest has been or is hereinafter granted by Borrower to Lender all proceeds thereof (collectively the "Collateral"). Title shall at all times be in Borrower's name, subject to Lender's security interest.

**2. Term, Payment and Late Charges**. The Obligations of Borrower shall be evidenced by an Agreement. The terms of each Agreement shall set forth Borrower's Obligations and each Agreement shall continue until Borrower satisfies all of Borrower's Obligations under, related to or with respect to such Agreement ("Term"). Borrower shall pay to Lender periodic payments of principal and interest without invoice or other written demand as more fully set forth in the Agreement ("Payments") and any and all other payments required to be paid. All Payments by Borrower to Lender under each Agreement shall be in legal tender of the United States of America in immediately available funds. Borrower's obligation to pay all Payments and other amounts due under each Agreement is absolute and unconditional under any and all circumstances (including any malfunction, defect or any inability to use any Item of Equipment) and shall be paid and performed by Borrower without notice or demand and without any abatement, reduction, diminution, setoff, defense, counterclaim or recoupment whatsoever, including any past, present or future claims that Borrower may have against Lender, any Supplier or any other person or entity whatsoever. To the fullest extent permissible under applicable law, Borrower hereby waives demand, diligence, presentment, protest, notice of dishonor, notice of nonpayment and notices and rights of every kind. If any Payment or other amount is not received within ten days of when due, Borrower, shall pay a late charge equal to the greater of 5% of the delinquent amount or $25.00, provided that such late charge shall not exceed the maximum late charge allowed by applicable law. Lender may further charge additional late charges for each month such Payments remain outstanding, not to exceed the highest rate allowed by applicable law, to compensate Lender for the loss of its bargain, which Borrower agrees is reasonable. Late Payments may be applied to unpaid Obligations as Lender in its sole discretion may determine.

**3. Selection of Equipment; Disclaimer of Warranties**. Borrower agrees that: (a) Borrower selected the Equipment and has not relied on any representation or warranty by Lender in connection with such selection; and (b) Lender is not an agent of any Supplier and no Supplier is an agent of Lender or otherwise authorized to bind Lender to any representation, warranty or agreement. BORROWER AGREES THAT THE EQUIPMENT IS FINANCED "AS IS, WHERE IS AND WITH ALL FAULTS" AND LENDER DOES NOT MAKE, HAS NOT MADE, AND SHALL NOT BE DEEMED TO MAKE, AND DISCLAIMS ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OR FITNESS OF THE EQUIPMENT), it being agreed that all such risks, as between Lender and Borrower, are to be borne by Borrower. Lender shall have no responsibility or liability to Borrower or any other person with respect to any of the following, (i) any liability to Borrower or any third party caused or alleged to be caused by any Item; or (ii) any consequential damages, loss of business or anticipated profits.

**4. Use and Maintenance of Equipment**. (a) Borrower agrees: (i) Borrower will use the Equipment only for its originally-intended business purpose and not for consumer, personal, family or household use; (ii) the Equipment will at all times be used, operated, maintained, serviced and repaired in compliance with warranty, requirements of insurance, operating manuals, rules, regulations and orders of any law or regulatory body, including Department of Transportation requirements, permits and registration requirements applicable to the Equipment and; (iii) without Lender's prior written consent, Borrower will not move any Item outside the continental United States; (iv) Borrower shall, at its expense, cause qualified parties to make all modifications and improvements and maintenance to the Equipment required by law or otherwise, and will not make other modifications or improvements to the Equipment without the prior written consent of Lender; (v) Borrower is current in and shall pay when due all registration, taxes, toll violations and other similar charges or costs arising from or related to the Equipment; and (vi) Borrower shall maintain and use the Equipment, at its sole cost and expense, in good and safe operating order, in like new condition with the exception of ordinary wear and tear. Borrower will give immediate written notice to Lender of its receipt of any demand, notice or legal proceeding relating to any Item.

**5. Inspection and Financial Reports**. (a) Lender, or any agent designated by Lender may enter upon any of Borrower's premises or any location where any Item is located or used, during reasonable business hours, to inspect such Item and any reports or records. Borrower agrees that Lender may install monitoring devices on the Equipment, which may provide data on use, location, maintenance and performance of the Equipment to the extent allowed under applicable law. Borrower agrees to pay a reasonable charge to Lender for the installation of such monitoring devices on each Item and further agrees not to tamper or alter with such device. (b) Upon Lender's request, Borrower will furnish (or cause to be furnished) to Lender promptly, but in no event later than 10 days information, financial or otherwise, as Lender may reasonably request from time to time, including without limitation financials statements and information pertaining to Borrower, the Equipment or any guarantor.

**6. Loss of Equipment; Damage to Equipment**. Borrower shall bear the entire risk of loss, theft, damage to or destruction of the Equipment (including any condemnation, seizure, or requisition of title or use) (collectively an "Event of Loss") from any cause whatsoever. No Event of Loss shall relieve Borrower from making any Payment or any other obligations hereunder. Borrower shall immediately notify Lender of any insurance claim and of any Event of Loss or material damage of any Item, and inform Lender of the circumstances and extent of the Event of

Master EFA

Page 1 of 7

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

Case 26-11011-djb   Doc 8-2   Filed 03/25/26   Entered 03/25/26 11:46:40   Desc
Exhibit A Executed Agreement with Title   Page 3 of 13

Loss. Upon an Event of Loss, Borrower shall place such Equipment in good repair and working order so that the Equipment is at least of the same utility, value and marketability; and upon an Event of Loss that results in the condemnation, loss, theft, disappearance or damage that is uneconomical or difficult to repair, as determined by Lender, Borrower will promptly pay to Lender an amount under the applicable Agreement equal to the Casualty Value. "Casualty Value" means the following sum under the applicable Agreement: (i) any accrued and unpaid Payments, (ii) all accrued and unpaid interest or other charges then due, (iii) the present value of all remaining Payments discounted to present value at 3.0% (the "Discount Rate") and (iv) any other amounts necessary to provide Lender with all of the benefits of its bargain. Lender may require that the Borrower pay the Casualty Value whether all or only a portion of the Equipment subject to an Agreement experiences an Event of Loss. Any proceeds received by Lender or Borrower as the result of an Event of Loss with respect to any Item (including insurance proceeds and proceeds of condemnation or requisition) shall be applied at Lender's election, in whole or in part, to (a) repair or replace such Item or any part thereof, or (b) satisfy any of any of Borrower's Obligations. Borrower shall also pay any costs and expenses (including Attorneys' Fees or the cost to engage an attorney even if no suit or claim is filed) incurred by Lender in connection with its exercise or protection of its rights and interests hereunder, including without limitation titling costs or other fees to effectively enforce Lender's interest in any item of Equipment. If no Event of Default has occurred and is continuing and no event or condition has occurred that with notice and/or passage of time could constitute an Event of Default, upon the payment of the Casualty Value with respect to any Agreement, and the payment of any and all other amounts due and payable to Lender, Lender shall release its security interest in such Items; provided that Borrower's Obligations with respect to taxes, indemnities and reimbursements shall survive.

7. **Insurance**. Borrower shall procure and maintain on or with respect to all Equipment at Borrower's sole cost and expense insurance coverage in such amounts, forms and with such responsible insurers whom maintain an acceptable A.M. Best rating satisfactory to Lender, all of the foregoing satisfactory to Lender, provided that Lender may require Borrower on reasonable notice to change such form, amount or company to comply herewith), including, without limitation: an all risk physical damage insurance against all risks of theft, loss or damage from every cause whatsoever in an amount not less than the greater of the full replacement cost of each item of Equipment or the Casualty Value, with Lender and its successors and/or assigns named as lender loss payee and if reasonably requested by Lender, other or additional coverage. Borrower shall waive Borrower's rights and have its insurance carrier waive its right of subrogation against Lender for any and all loss or damage. All policies shall contain clauses requiring the insurer to furnish Lender with at least 30 days prior written notice of any material change, cancellation, or nonrenewal of coverage and stating that coverage shall not be invalidated against Lender or its assigns because of any violation of any condition or warranty contained in any policy or application therefor by Borrower or by reason of any action or inaction of Borrower. Borrower agrees to inform Lender immediately in writing of any notices from, or other communications with, any insurers that may in any way adversely affect the insurance policies being maintained pursuant to this Section. No insurance shall be subject to any co-insurance clause. Upon request by Lender, Borrower shall furnish Lender with a certificate of insurance, proper endorsements or other evidence satisfactory to Lender that such insurance coverage is in effect. If Borrower shall fail to carry any insurance required hereunder, Lender (without obligation and without waiving any default or Event of Default by Borrower hereunder) may do so at Lender's sole option and at Borrower's sole cost and expense, and Lender may make a profit on the provision of any such insurance, provided further that Borrower agrees to pay Lender an insurance default risk fee of $500.00 to compensate Lender's administrative expenses. Borrower agrees Lender is not a seller of insurance and Lender is not in the insurance business. Borrower will deliver to Lender evidence of compliance with this Section satisfactory to Lender, including any copies of policies, certificates and endorsements, with premium receipts therefor, on or before the date of execution by Borrower of the applicable Agreement and thereafter within two (2) business days after Lender's request. Any insurance proceeds received by Lender will be applied, at Lender's option, to repair or replace the Equipment, or to pay Lender the Agreement discounted at the Discount Rate. Lender shall be under no duty to ascertain the existence of or to examine any such policy or to advise Borrower in the event any such policy shall not comply with the requirements hereof.

8. **Negative Covenants of Borrower**. Without Lender's prior written consent, Borrower shall not: (a) sell, assign, dispose, lease or otherwise transfer (including by operation of law) any Item or any of its interest in or rights under any Agreement; (b) change Borrower's name, state of organization, organizational structure (by merger or otherwise); (c) mortgage, pledge, grant a security interest in or otherwise permit, suffer or cause any Lien to exist or remain on any Item (except those in favor of Lender as contemplated under any Agreement); (d) record or attempt to record a termination statement under the UCC; (e) permit any Equipment to be located in a state or jurisdiction other than the state in which such Equipment is currently titled for any continuous period of time that could subject such Equipment to the titling or registration laws of such other state or jurisdiction, or remove or disable any GPS device, provided that Borrower agrees to return any Item to a location reasonably specified by Lender whenever the GPS device needs repair or replacement; (f) use any Item of Equipment to store, transport, contain or deliver any hazardous materials in violation of any environmental laws or transport persons for hire or (g) allow anyone who is not an Authorized User to operate the Equipment. "Authorized User" means Borrower's employees or authorized users who are at least 21 years of age and possesses a current and valid driver's license and authorized to operate the Equipment under the Borrower's insurance policies and all other applicable laws.

9. **Events of Default**. An "Event of Default" or "Default" shall be deemed to have occurred under all Agreements and all Other Agreements with Lender upon the occurrence of any of the following events or circumstances: (a) Borrower fails to pay any Payment or any other amount payable with respect to any Agreement or Obligations within ten (10) days of its due date; (b) there occurs any event or condition which after notice, lapse of time or after both notice and lapse of time will permit acceleration of any Obligations or would become an Event of Default, which is not cured in ten (10) days provided such failure is capable of cure; (c) Borrower fails to maintain insurance as required by each Agreement or breaches any of the covenants contained in Section 8 hereof; (d) any representation or warranty of Borrower or any Guarantor to Lender is false in any material respect; (e) Borrower or any Guarantor breaches any representation, warranty, term, condition or covenant herein or in any Agreement, Guaranty, or any other present or future agreement with Lender or an Affiliate of Lender; (f) Borrower or any Guarantor becomes insolvent, dissolves or ceases to do business as a going concern, makes an offer of settlement, extension or composition to its unsecured creditors generally, makes an assignment for the benefit of its creditors, or files a petition for an order for relief under the United States Bankruptcy Code or any similar federal or state law, or has such a petition filed against it which is not dismissed within sixty (60) days; (g) the property of Borrower or any Guarantor is attached or a trustee, receiver or other custodian is appointed for Borrower or for any of Borrower's property; (h) Borrower or any Guarantor is a party to a merger, consolidation or transfer of substantially all of its assets, suffers a material change in its senior management, sells or otherwise transfers any facility in which any Item is located or suffers a material adverse change in its business or financial condition after the date hereof; (i) Borrower permits the sale or transfer of any shares of its capital stock or of any ownership interest in Borrower to any person, persons, entity or entities (whether in one transaction or in multiple transactions) which results in a transfer of a majority interest in the ownership and/or the control of Borrower from the person, persons, entity or entities who hold ownership and/or control of the Borrower as of the date of this Master Agreement (including by operation of law); (j) a general partner, managing partner or managing member of Borrower or any Guarantor (or Borrower or any Guarantor if any such party is an individual) dies, becomes legally incompetent, or suffers any other event described in this Section; (k) Borrower or any Guarantor defaults under any agreement, instrument, guaranty, loan, lease, note, or other obligation of any kind on the part of Borrower in favor of Lender for money borrowed or the lease

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

of real or personal property; (l) Borrower attempts to repudiate any Agreement or revoke acceptance of any Item of Equipment or Borrower attempts to repudiate, revoke, rescind, withdraw or cancel a Guaranty or (n) Borrower sells, attempts to sell, transfer, assign, lease, sublease, rent or otherwise transfer (including by operation of law) possession of any Item of Equipment or any rights, title or interest in any Item of Equipment, unless prior written consent is obtained from Lender in a signed writing; (o) any Item of Equipment is not located in such location as required hereunder; or (p) Borrower tampers, alters disconnects or removes the GPS device in any Item. Borrower acknowledges that an Event of Default under any Agreement shall constitute an Event of Default under all Agreements and any other leases, contracts, instruments or agreements for the borrowing of money with Lender or an Affiliate of Lender. Notwithstanding the foregoing or anything herein to the contrary, Agreements shall not be so cross-defaulted or cross-collateralized if held by different banks or lenders who are not affiliates.

**10. Rights and Remedies upon Default.** (a) Upon the occurrence of an Event of Default, Lender shall have any and all rights and remedies existing at law or in equity and shall have the right, at its sole election, at any time to exercise any or all of such remedies concurrently, successively or separately, without notice to Borrower (unless specifically stated in such Schedule). Without limiting the foregoing, Lender may at its election declare any or all Agreements to be in default and exercise any and all rights and remedies available to Lender, including the following rights and remedies: (i) proceed at law or in equity to enforce specifically Borrower's performance or to recover damages; (ii) require Borrower to immediately assemble, make available and if requested by Lender deliver the Equipment (or, if so requested, any Items designated by Lender) to Lender at a time and place designated by Lender; (iii) enter any premises where any Item may be located and repossess, disable or take possession of the Equipment (and/or any attached or unattached parts) by self-help, summary proceedings or otherwise without liability for rent, costs, damages or otherwise; (iv) use Borrower's premises for storage without rent or liability; (v) sell, lease or otherwise dispose of the Equipment or such Items at private or public sale, whether the Equipment is present at such sale and with or without notice except to the extent required by applicable law, and if notice is required by law such requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the public sale or the time after which any other disposition is to be made; (vi) disable or keep idle all or part of the Equipment or such Items; or (vii) declare all of Borrower's Obligations immediately due and payable including the following ("Default Amount"):(aa) any accrued and unpaid Payments or other sums then owed to Lender; (bb) the present value of all remaining Payments discounted to present value at the Discount Rate; (cc) any prepayment premium set forth in each Agreement; and (dd) all costs and expenses incurred by Lender in any repossession, transportation, recovery, storage, refurbishing, advertising, repair, sale, lease, or other disposition of the Equipment or Lender's enforcement of its rights hereunder, including Attorneys' Fees and any brokers' or similar fees or any other fees, costs or expenses resulting from the Event of Default and all other amounts due hereunder. In addition to the Default Amount, Borrower shall pay to Lender interest on any late Payment or other amount owed from the date due until paid at a rate of 18% per annum or the highest rate allowed by law, whichever is lower. Notwithstanding the foregoing, upon the occurrence of an Event of Default under Section 9 (f) - 9 (h) above, Borrower's Obligations shall automatically accelerate and Borrower shall immediately owe to Lender, without notice or demand from Lender, the Default Amount. Borrower expressly acknowledges that each Agreement sets forth a reasonable amount and reasonable formula for calculation of liquidated damages in light of the anticipated harm caused by any default by Borrower hereunder and that such harm would otherwise be difficult or impossible to calculate or ascertain. (b) In the event Borrower pays to Lender the Default Amount and any and all other amounts due and payable to Lender hereunder as a result of the Event of Default (in good, collected and indefeasible funds) prior to the date Lender enters into a contract or otherwise determines that it is obligated to a third party with respect to the disposition of the Equipment, Lender shall release its security interest in the Equipment (without recourse, representation or warranty, "AS IS, WHERE IS AND WITH ALL FAULTS") and any right, title or interest Lender may have

in such Equipment. In the event Lender disposes of the Equipment, it shall apply any proceeds received therefrom (after payment) to Borrower's obligations in the order Lender determines. "Net Proceeds" shall mean the after-tax amount received by Lender in immediately-available funds not subject to recapture, rebate or divestiture from such purchaser; or in the case of a purchase of the Equipment which Lender finances pursuant to a lease intended as security or other equipment finance arrangement or in the case of a disposition pursuant to a true lease (any such leases or finance agreements being referred to hereinafter as a "Replacement Agreement"), an amount equal to the sum of all non-cancellable periodic payments and any purchase election, purchase requirement or balloon payment set forth in the Replacement Agreement, discounted to present value at the implicit rate of interest of the Replacement Agreement as determined by Lender. (c) With respect to Lender's rights to dispose of the Equipment or any Items, Borrower agrees that Lender shall have no obligation, subject to any legal requirements of commercial reasonableness, to clean-up or otherwise prepare the Equipment or any Items for disposition; Lender may comply with any state or federal law requirements that Lender deems to be applicable or prudent to follow in connection with any such disposition; and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any such disposition. If Equipment delivered to or picked up by Lender contains goods or other property not constituting Equipment, Borrower agrees that Lender may take such other goods or property, provided that Lender makes reasonable efforts to make such goods or property available to Borrower after repossession upon Borrower's written request. (d) If, after any Default, any Agreement is placed in the hands of an attorney, collection agent or other professional for collection or enforcement of any other right or remedy of Lender, Borrower shall pay all Attorneys' Fees and associated costs and expenses and all costs of collections, which shall be assumed to be Lender's out of pocket costs plus 20% of such amounts. Borrower agrees that such costs are reasonable in light of the anticipated harm caused to Lender. Forbearance as to any default shall not be deemed a waiver, all waivers to be enforceable only if specifically provided in writing by Lender, and waiver of any default shall not be a waiver of any other or subsequent default. To the extent permitted by applicable law, Borrower waives any rights that may require Lender to sell or otherwise use any Equipment in mitigation of Lender's damages.

**11. Indemnification.** Borrower hereby agrees to defend, indemnify and hold Lender and its successors and/or assigns and any and all employees, agents, directors, partners, shareholders, officers, members of the foregoing and any assignee or secured party of Lender, harmless from and against: (a) all claims, allegations, demands, suits, actions, and legal proceedings incurred incident to, arising out of, or in any way connected with, any Agreement, any Item, or the transactions contemplated hereby, whether civil, criminal, administrative, investigative or otherwise, including arbitration, mediation, bankruptcy and appeal and including any claims, demands, suits and legal proceedings arising out of (i) the actual or alleged manufacture, purchase, financing, ownership, delivery, rejection, non-delivery, possession, use, transportation, storage, operation, maintenance, repair, return or other disposition of the Equipment; (ii) the existence of latent and other defects (whether or not discoverable by Borrower or Lender); (iii) patent, trademark or copyright infringement; or (iv) any alleged or actual default by Borrower (all of the foregoing are referred to as "Actions"); and (b) any and all penalties, losses, liabilities (including the liability of Borrower or Lender for negligence, tort and strict liability), damages, costs, court costs, harms, judgments and any and all other expenses (including Attorneys' Fees, judgments and amounts paid in settlement and other legal and non-legal expenses incurred investigating or defending any Action) incurred incident to, arising out of or in any way connected with any Actions, any Agreement, any Items, or any other instrument, document or agreement executed in connection with or contemplated by any of the foregoing (collectively, "Losses"). Borrower agrees to give Lender prompt notice of any claim or liability hereunder. Borrower shall, at Lender's election, appear and defend any Action and/or pay the cost of the defense of any Action brought against Lender, either alone or in conjunction with others. Borrower shall satisfy, pay and discharge all Losses that may be incurred by, or recovered against, Lender in connection with any Action.

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

Case 26-11011-djb   Doc 8-2   Filed 03/25/26   Entered 03/25/26 11:46:40   Desc
Exhibit A Executed Agreement with Title   Page 5 of 13

The foregoing Indemnities are continuing indemnities and shall survive expiration or termination of each Agreement for any reason.

**12. Representations and Warranties.** Borrower represents, warrants, covenants and agrees that: (a) Borrower is duly organized, validly existing and in good standing under the laws of the states in which Borrower operates and in such states where possession of any Item would require such qualification; (b) the name of Borrower is Borrower's full and correct legal name; (c) Borrower has full power and authority to execute, deliver and perform all its Obligations under each Agreement; (d) this Master Agreement and each Agreement has been, or will be when entered into, duly authorized by all necessary action of Borrower, duly executed on behalf of Borrower and constitutes a valid and legally binding obligation of Borrower, enforceable in accordance with its terms; (e) the execution and performance by Borrower of each Agreement and the validity hereof, do not require the consent or approval of, giving of notice to, registration with, or taking of any other action in respect of, any state, federal or other governmental authority or agency, any shareholders, partners, members, trustees or holders of any indebtedness of Borrower; or if any such consent, approval, notice, registration or action is required, it has been obtained, given or taken, and evidence thereof has been delivered to Lender or will be delivered concurrently with the execution of each Agreement; (f) the execution, delivery or performance by Borrower of its Obligations under each Agreement shall not contravene, in any material respect (i) any law; (ii) any provision in Borrower's articles of organization or incorporation, certificate of limited partnership or incorporation, operating agreement, partnership agreement, by-laws or similar chartering or governing documents, instruments or agreements; (iii) any provision in any existing mortgage, indenture, loan or credit agreement, or other contract or agreement binding on Borrower; or (iv) any judgment, decree, order, franchise or permit applicable to Borrower; (g) neither the execution and delivery of each Agreement nor the fulfillment of, or compliance with, the terms and provisions hereof, will result in the creation of any Lien upon all or any portion of the Equipment (other than under an Agreement); (h) Borrower is not a party to any agreement or instrument, or subject to any chartering or governing document, or other corporate or business restriction, materially and adversely affecting its business, properties, assets, operations or condition (financial or otherwise), and Borrower is not in default in the performance, observance or fulfillment of any of the Obligations, covenants or conditions contained in any agreement for borrowed money or other material agreement or instrument to which it is a party or by which it may be bound in any manner; (i) all balance sheets, profit and loss statements, statements of income or other financial statements of Borrower, heretofore or hereinafter delivered to Lender, have been prepared in accordance with generally accepted accounting principles and fairly present the financial position of Borrower; (j) Borrower is not in default under any Agreement; (k) there are no pending or threatened actions or proceedings before any court, administrative agency or other tribunal or body or judgments which may materially adversely affect Borrower's financial condition or operations; (l) Borrower is, and will continue to be through the period of effectiveness of each Agreement either the owner, the lessee or the sublessee of each and every facility in which any Item shall be located; (m) Borrower shall notify Lender in writing within five (5) days after any Lien shall attach to any Item, and any such notice shall specify the location of such Item on the date of such notification, the amount and circumstances of any claim giving rise to such Lien and the identity and address of the lienholder; (n) Borrower nor any guarantor of its Obligations hereunder, and no individual executing any Agreement or any other document executed in connection with any Agreement is named on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury or otherwise a party with whom Lender is prohibited from doing business pursuant to such regulations and Borrower is in compliance with any Bank Secrecy Act regulations and all other applicable laws or regulations to prevent money laundering; (o) neither Lender nor any of Lender's officers or employees is an agent of any Supplier; (p) neither Supplier nor any of Supplier's officers or employees is an agent of Lender nor otherwise authorized to bind Lender to any representation, warranty, term, condition or agreement; (q) if requested by Lender or if required by federal, state or local law, Borrower shall, at

Borrower's sole cost and expense, permanently affix and maintain on (or as required by applicable law), Item determined by Lender, or as required by applicable law, in a prominent place, a sign, legend, plate, plaque, tag or other identifying label disclosing Lender's security interest in the Equipment; and (r) no transaction under any Agreement will be a "Consumer Transaction" as defined in the UCC. All representations and warranties contained herein shall be continuing in nature and in effect at all times prior to Borrower satisfying all of Borrower's obligations to Lender.

**13. Power of Attorney; Further Assurances.** Borrower hereby irrevocably appoints Lender and its designee and authorizes and grants to Lender and such designee a power of attorney in Borrower's name as Borrower's attorney-in-fact to execute all insurance documentation, all checks or other insurance proceeds, and to insert, supply and correct missing information, obvious errors, correct Equipment descriptions, including vin and serial numbers, and to insert dates, including without limitation the Commencement Date after Borrower's execution of a Schedule in each Lease and the documents executed in connection herewith or therewith, and to apply for and execute a certificate of title and/or notice of liens for any Item of Equipment that is required to be titled under the laws of any jurisdiction where such Equipment is or may be used and/or to transfer title thereto upon the exercise by Lender of its remedies upon an Event of Default by Borrower under this Master Agreement, provided that Borrower shall furnish to Lender all certificates of title within thirty (30) days of any titling effected by Borrower. Additionally, Borrower will do whatever Lender deems necessary to have a statement of the security interest of Lender and any assignee of Lender in the Equipment noted on any certificate of title relating to the Equipment and will deliver said certificate to Lender. Borrower will, upon demand of Lender and at Borrower's sole cost and expense, do and perform any other act and will execute, deliver, file or record any and all further writings or records requested by Lender to protect Lender's rights hereunder, including: (a) UCC financing statements, charges for certificates of title and/or retitling or other records under the UCC or other applicable law as currently in force or as subsequently revised, enacted or re-enacted; and (b) duly executed landlord's or mortgagee's waivers from any person claiming an interest in any real property or improvements on, or in, which any Item is located. Borrower further authorizes Lender or its designee to enter any information that does not materially change the terms of any Agreement or this Master Agreement or other writing executed in connection with any Agreement, or any Item, to file or record financing statements, amendments to financing statements and continuations or to execute and deliver or otherwise authenticate and communicate any writing or record and take any other actions that Lender reasonably deems necessary or desirable to protect Lender's interest under each Agreement. Borrower further authorizes Lender and its designee to transmit and file any such statements, ministerial changes and other items by electronic means. If Borrower shall fail to provide any insurance, remove any Lien, pay any Tax, provide any indemnity, or otherwise perform any obligation hereunder that may be performed or satisfied by the payment of money, Lender may, in addition to and without waiver of any other right or remedy herein provided, pay such sum for Borrower's account. In such event, Borrower shall reimburse Lender immediately upon demand for all such sums, together with interest at 18.0% per annum or the highest rate allowable under applicable law, whichever is lower. Borrower agrees that any default described in this Section is a Default. Borrower agrees that Lender may file financing statements prior to execution of the applicable Agreement to protect fully Lender's interest and Borrower agrees that such filings are authorized and ratified.

**14. Definitions and Rules of Construction.** As used in each Agreement and this Master Agreement: (a) unless otherwise stated herein, all references in the Master Agreement to Sections shall be to Sections of the Master Agreement and "Accounts", "Equipment", "Chattel Paper" and other UCC terms not specifically defined herein shall have the meaning as set forth in the UCC; (b) the terms "herein" or "hereunder" or like terms shall be deemed to refer to this Master Agreement as a whole and not to a particular section; (c) terms "include" or "including" shall mean "include" or "including", as the case may be, without limiting the generality of any description or word preceding such term; (d) the expression "satisfactory to Lender", "determined by Lender", "in

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

Case 26-11011-djb    Doc 8-2    Filed 03/25/26    Entered 03/25/26 11:46:40    Desc
Exhibit A Executed Agreement with Title    Page 6 of 13

Lender's judgment", at Lender's election" or similar words which grant Lender the right to choose between alternatives even if words of limitation, such as "sole" or otherwise, are omitted from such provisions shall mean that the satisfaction, judgment, choices and opinions are to be made in Lender's sole discretion; (e) the term "Affiliate" of a person or entity means any person or entity which directly or indirectly beneficially owns or holds 10% or more of any class of voting stock or other interest of such person or entity or directly or indirectly controls, is controlled by, or is under common control with such person where the term "control" means the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, by contract, or otherwise; (f) the term "Attorneys' Fees" shall include any and all attorneys' fees incurred by Lender (whether by its use of in-house counsel or otherwise) incident to, arising out of or in any way connected with Lender's interests in or defense of any Action or Lender's enforcement of its rights and interests under each Agreement, including attorneys' fees incurred by Lender to collect sums due, during any work-out, with respect to settlement negotiations, or in any bankruptcy proceeding (including attorneys' fees incurred in connection with any motion for relief from the automatic stay and any motion to assume or reject any Agreement); (g) the term "Equipment" includes all items of personal property described on each Schedule, including all inventory, fixtures or other property leased or financed under such Agreement, any related software (embedded therein or otherwise) and any and all general intangibles, replacements, improvements, repairs, additions, attachments, accessories and accessions thereto whether or not furnished by the Supplier; (h) the term "Guarantor" shall mean any guarantor of Borrower's Obligations hereunder and the term "Guaranty" shall mean any guaranty executed by a Guarantor for the benefit of Lender; (i) the term "Lien" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lien (statutory or other, including tax and materialmen's liens), privilege, or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever; (j) the term "material" as used herein shall be construed to mean significant in Lender's reasonable judgment, taking into account all relevant facts and circumstances including the nature and amount of financial exposure to Lender; (k) the term "Obligations" means each and every debt, liability and obligation, including obligations of performance, of every type and description Borrower may now or at anytime hereafter owe to Lender and any Affiliate of Lender whether under this Master Agreement or under any Other Agreement, regardless of how such Obligation arises or by what agreement or instrument it may be evidenced, whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, joint and several, and all costs and expenses incurred by Lender to obtain, preserve, perfect and enforce the security interest granted herein and to maintain, preserve and collect the property subject to the security interest, including but not limited to all Attorney's Fees and expenses of Lender to enforce any Obligations whether or not by litigation; (l) the term "Other Agreements" means any contract, loan, lease, instrument or any other agreement for the borrowing of money with Lender or any Affiliate of Lender, including without limitation any factoring agreement, loan agreement, note, or agreement for any extension of credit; (m) the term "Supplier" means any supplier, manufacturer or other person or entity from whom the Equipment is purchased; (n) the term "Supply Contract" means the contract under which the Equipment was purchased from the Supplier or purchase order therefor; and (o) the "UCC" means the Uniform Commercial Code as adopted in the State of California. The captions or headings in this Master Agreement and each Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of this Master Agreement or any Agreement. As used herein all singular terms include the plural form thereof, and vice versa. The exhibits annexed hereto are incorporated herein by this reference and made a part hereof as if contained in the body of this Master Agreement. All references to sections hereunder shall be deemed to refer to sections of this Master Agreement, unless otherwise expressly provided, whether or not "hereof", "above", "below" or like words are used. Each Agreement has been drafted by counsel for Lender as a convenience to the parties only and shall not, by reason of such action, be construed against Lender or any other party. Borrower agrees that it has had full opportunity to

review each Agreement and has had access to counsel of its choice to the extent it desired and any uncertainty or ambiguity shall not be interpreted against any party and to give them equal effect. Borrower agrees that Lender may request and review credit reports regarding Borrower and any Guarantor, Affiliate or owner of any interest in Borrower. Each Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Each Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. Any Agreement may, by its express terms, supplement or amend this Master Agreement as it applies to such Agreement and may possibly, among other things, add additional Events of Default or covenants.

**14. General Terms.** (a) Notices. Any notices or demands required or permitted under this Master Agreement shall be sent in writing to Lender and Borrower at the address for such party set forth on the first page hereof of or to any other address as may be specified by a party by a notice given as provided herein and shall be sent by certified mail (return receipt requested), by a nationally recognized express courier service (such as Federal Express) or personally served. Each such notice shall be deemed to be duly given when mailed upon deposit in any depository maintained by the United States Post Office, when deposited with a nationally recognized express courier service or when personally served, provided that Borrower agrees that Lender may send any notice and demand by electronic means to the e-mail address on file with Lender for Borrower. (b) Assignment. BORROWER MAY NOT SELL, TRANSFER, ASSIGN, LEASE, RENT OR OTHERWISE TRANSFER POSSESSION OF ANY EQUIPMENT OR ITS RIGHTS OR OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY OTHER AGREEMENT WITHOUT LENDER'S PRIOR WRITTEN CONSENT. Each Agreement and all and any part of the rights of Lender thereunder shall be assignable and transferable by Lender absolutely or as security, without notice to Borrower, subject to the rights of Borrower hereunder. Upon request to Borrower by Lender of any such assignment, Borrower shall promptly acknowledge in writing its obligations under the Agreement. Any such assignment shall not relieve Lender of its obligations hereunder unless specifically assumed by the assignee. UPON REQUEST BY ASSIGNEE, BORROWER AGREES IT SHALL PAY SUCH ASSIGNEE ALL PAYMENTS HEREUNDER WITHOUT ANY DEFENSE, RIGHTS OF SETOFF OR COUNTERCLAIMS (WHICH SHALL NOT BE ASSERTED AGAINST AN ASSIGNEE) AND SHALL NOT HOLD OR ATTEMPT TO HOLD SUCH ASSIGNEE LIABLE FOR ANY OF LENDER'S OBLIGATIONS, AND ANY SUCH REQUEST SHALL BE BINDING ON BORROWER AND LENDER. (c) Counterparts. Sole Original. This Master Agreement, each Agreement and all documents executed in connection herewith may be executed and delivered in counterparts all of which shall constitute the same agreement. The exchange of signed copies by facsimile or electronic transmission (including pdf files) shall constitute effective execution and delivery and may be used in lieu of manually signed documents. Borrower hereby consents to the execution of this Master Agreement, each Schedule and all other documents in connection herewith or otherwise with Lender electronically. Signatures of the parties transmitted by facsimile or electronic transmission qualify as authentic original signatures for purposes of enforcement thereof, including all matters of evidence and the "best evidence" rule. When a counterpart of each Schedule containing Borrower's original, faxed or electronic signature is (i) manually signed by Lender or (ii) electronically signed by Lender and stored as an electronic record that is under Lender's control, then such counterpart shall constitute the original authoritative version of a Schedule for all purposes under the UCC and shall constitute the sole "chattel paper" original, provided that if the "paper out" process shall have occurred pursuant to the eOriginal Product Reference Guide and there shall simultaneously exist both the "Paper Out" printed version and an electronic version of the Schedule, then the "Paper Out" printed version of the Schedule as identified in the audit record and corresponding affidavit shall constitute the sole original authoritative version and the sole "chattel paper". Reference herein to eOriginal shall mean eOriginal, Inc, or any successor electronic custodian appointed by Lender. Borrower agrees not to raise as a defense to the enforcement of any document or any Agreement, Schedule or other document that it was executed or transmitted by electronic means. Borrower waives notice of acceptance of an Agreement and receipt of a

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

copy of the originally signed Agreement or Schedule. Notwithstanding anything herein to the contrary, if Borrower signs any document or Agreement and/or delivers any such document or Agreement to Lender electronically, Lender reserves the right to require Borrower to sign any document or Agreement manually and to deliver to Lender an original of such document containing Borrower's manual signature. (d) Miscellaneous. Time is of the essence. In the event there is more than one Borrower named in this Master Agreement or in any Agreement, the obligations of each shall be joint and several and all Collateral described in any Agreement shall secure all Obligations of each Borrower whether such property is owned jointly, whether in whole or in part or individually by a Borrower. Lender may, in its sole discretion and with no obligation to do so, allow Borrower to make payments by debit and credit cards which shall be subject to Lender's then current processing fees at the time of each payment. Any returned or dishonored payment hereunder shall be subject to a minimum $30.00 returned payment fee. The provisions of each Agreement shall be severable and if any provision shall be invalid, void or unenforceable. Each Agreement shall be binding upon and shall inure to the benefit of the parties and their heirs, personal, successors and assigns (subject to Section 8). Lender's failure at any time to require strict performance by Borrower with any of the provisions hereof shall not waive or diminish Lender's right thereafter to demand strict compliance therewith. Borrower acknowledges that Lender's approval of any Equipment, Supplier or other parties or documentation relating to any Agreement will be solely for the protection of Lender's interests in the Equipment and under such Agreement and under no circumstances shall be construed to impose any responsibility or liability of any nature whatsoever on Lender. It is the intention of the parties to comply strictly with applicable usury laws and, accordingly, in no event and upon no contingency shall Lender ever be entitled to receive, collect, or apply as interest any interest, fees, prepayment premiums, charges or other payments determined by a court of law to be the equivalent of interest, in excess of the maximum rate which Lender may lawfully charge under applicable statutes and laws from time to time in effect; and in the event that Lender ever receives, collects, or applies as interest any such excess, such amount which, but for this provision, would be excessive interest, shall be applied to the reduction of the principal amount of the loan, provided, however, that Borrower waives, to the extent permitted by law, the right to seek such reduction; and if the principal amount of the loan, all lawful Interest thereon, and all lawful fees and charges in connection therewith, are paid in full, any remaining excess shall forthwith be paid to Borrower, or other party lawfully entitled thereto. No variation or modification of any Agreement or any term or provision hereof, or waiver, discharge, cancellation or termination of any of its provisions or conditions, shall be valid unless in a writing and signed by an authorized

representative of the party against whom the enforcement of such variation, modification, waiver, discharge, cancellation or termination is sought. (e) Security Deposit. If required by Lender, Borrower shall pay a security deposit ("Security Deposit") as specified on an Agreement. The Security Deposit shall be paid upon Borrower's execution of such Agreement and will be returned to the Borrower within thirty (30) days after all obligations have been paid in full under such Agreement, provided that there are no uncured Events of Default by Borrower under any Agreement or any other obligation to Lender. Lender shall have the right to deduct from the Security Deposit any amount not paid to Lender when due. No such deduction shall diminish Borrower's obligation to pay any and all sums due Lender and any amounts deducted from the Security Deposit which are subsequently paid by Borrower shall be used to restore the Security Deposit to its original amount. Upon demand from Lender, Borrower shall pay the amount necessary to so restore the Security Deposit. Borrower agrees that the Security Deposit may be co-mingled with Lender's other funds and that no interest shall be due to Borrower on account of the Security Deposit.

**15. Governing Law; Jurisdiction; Jury Trial Waiver.** Each Agreement, this Master Agreement and all documents executed in connection therewith shall be governed by the laws of the state of California. Borrower acknowledges that each Agreement was entered into in San Bernardino County, California, and that the parties have agreed to the terms of each Agreement with the understanding that any action or proceeding arising from or related to any Agreement shall be maintained in the state or federal courts in said state and county, provided that Borrower acknowledges and agrees that Lender or any assignee of Lender may bring any action or proceeding in any jurisdiction where Borrower or any Equipment is located. Borrower submits to the foregoing jurisdiction and venue, waiving any claim of improper jurisdiction or venue or forum non conveniens, agreeing to accept service at Borrower's place of business in any action. AS PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER, provided that if any action is filed in a court of the State of California by or against any party in connection herewith or with any Agreement, the parties agree the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, and you agree that such proceeding shall be conducted in San Bernardino County, California, with California rules of evidence and discovery applicable to such proceeding and that you shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding. THIS CONSTITUTES A "REFERENCE AGREEMENT" UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638.

\*\*\*

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

Case 26-11011-djb    Doc 8-2    Filed 03/25/26    Entered 03/25/26 11:46:40    Desc
Exhibit A Executed Agreement with Title    Page 8 of 13

In witness whereof, the parties have executed this Master Agreement as of the date shown above.

| Lender | Borrower |
|---|---|
| **Crossroads Equipment Lease and Finance, LLC**<br>**a California Limited Liability Company** | **Zero Max Construction Inc**<br>**a Pennsylvania Corporation** |
| By: *Latisha Lowe* | By: |
| Printed<br>Name: Latisha Lowe | Name: Saydullo Askaralievich Usmonov |
| Title: Documentation & Funding Specialist | Title: President |

Co-Borrower: _____

By: _____

Name: _____

Title: _____

In Process

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

EQUIPMENT FINANCE SCHEDULE

Equipment Finance Schedule No. ███3401 dated **August 10, 2023** ("Schedule") to
Master Equipment Finance Agreement dated **August 10, 2023**
Between Crossroads Equipment Lease and Finance, LLC ("Lender") and
**Zero Max Construction Inc**
("Borrower")

This is a Schedule together with the terms and conditions of the Master Equipment Finance Agreement identified above ("Master Agreement"). All capitalized terms not herein defined shall have the meaning set forth in the Master Agreement and all terms and conditions of the Master Agreement are incorporated herein and shall remain in full force and effect except to the extent modified by this Schedule. Such modifications apply only for the Agreement created hereby. Borrower and Lender agree that this Schedule constitutes a separate

and distinct "Agreement" under the Master Agreement and if any provision in this Schedule conflicts with a provision in the Master Agreement, the provision in this Schedule shall control. Borrower hereby reaffirms on and as of the date hereof all terms, covenants representations and warranties contained in the Master Agreement.

| SUMMARY OF PAYMENT TERMS: | |
|---|---|
| Loan Amount: $200,955.00 | Term (months): 72 |
| Payment Due Date: 45 days following the Commencement Date and the same day of each Payment Period thereafter. | Payment Period: **Monthly in Arrears** |
| Payment: 72 @ $3,921.48<br><br>Interest Rate: 11.75 %<br>Balloon Payment: $0.00 | Documentation Fee: $495.00<br>Security Deposit: $0.00 |

**1. Grant of Security.** Borrower hereby grants to Lender a first priority security interest in the Collateral and all property in Section 3 below.

**2. Promise to Pay:** FOR VALUE RECEIVED, Borrower promises to pay to Lender at such address as may be designated from time to time by Lender, payments of principal and interest as follows: On the first Payment Due Date and on each successive Payment Due Date thereafter during the Term of this Agreement, Borrower shall pay to Lender the Payment. Borrower also agrees to pay per diem interest as invoiced by Lender from the date Lender first advances all or any portion of the Loan Amount at the interest rate used in computing the repayment terms above to the start of the first Payment Period.

**3. Equipment Description:**

| Condition | Year | Make | Model | VIN | Attachment & Serial No. |
|---|---|---|---|---|---|
| New | 2024 | Freightliner | CA126SLP | 3AKJHHDR3RSVB3218 | |

The equipment listed above, together with any equipment listed in the attached Exhibit A, if any, along with all accessories, exchanges, improvements, returns, substitutions, parts, attachments, accessions, credits, rebates, replacements, additions, and proceeds thereof, including all inventory, equipment, fixtures, machinery, spare parts, and other goods of every kind and description which is attached to or united with or otherwise used in connection with the personal property described above, and all accounts, books, records, general intangibles, payment intangibles, security deposits, chattel paper, all rentals, monies and proceeds from any lease, sublease or other arrangement, instruments, investment property, chattel paper, accounts, proceeds (including insurance proceeds) and documents arising from or associated with any of the foregoing property. After Borrower signs this Schedule, Borrower authorizes Lender to insert any missing information or change any inaccurate information (such as the model year of the Collateral or its serial number or VIN).

**4. Equipment Location: 9906 Bustleton Avenue G-11 Philadelphia, PA 19115.** The address of the Equipment Location is a bona fide business address. Provided that any motor vehicle or item of mobile equipment shall be permanently based and garaged at such location and may be moved within the contintential United States so long as it regularly returns to such location for five (5) days per month, unless otherwise agreed by Lender in writing.

**5. Miscellaneous.** This Agreement shall not be prepaid in whole or in part until thirteen months following the Commencement Date (as defined in the Delivery and Acceptance Certificate for this Schedule) except as a result of Borrower's payment of the Casualty Value upon an Event of Loss. Borrower shall have the right, on a Payment Date occuring after 12 Payments have been made pursuant to the terms of this Schedule, upon thirty (30) days' prior written notice to Lender, to prepay all (but not less than all) of this Schedule. If Borrower makes a permitted or required prepayment of principal under this Schedule, Borrower shall pay to Lender the amount of principal permitted or required to be prepaid, together with all accrued interest thereon, and all other amounts owing under this Schedule, and the applicable Prepayment Fee (to the maximum extent allowed by applicable law), none of which shall be refundable. As used herein, "Prepayment Fee" means an amount equal to the principal amount being prepaid, multiplied by: five percent (5%) if prepayment shall occur (voluntarily by Borrower, upon a Default or otherwise) after 12 Payments have been made and before 25 Payments have been made; four percent (4%) if prepayment shall occur (voluntarily by Borrower, upon a Default or otherwise) upon or after making 24 Payments and before 37 Payments have been made; three percent (3%) if prepayment shall occur (voluntarily by Borrower, upon a Default or otherwise) upon or after making 36 Payments and before 49 Payments have been made; two percent (2%) if prepayment shall occur (voluntarily by Borrower, upon a Default or otherwise) upon or after making 48 Payments and before 61 Payments have been made; and zero (0%) if prepayment shall occur (voluntarily by Borrower, upon a Default or otherwise) after making 60 Payments. Borrower acknowledges and agrees that (i) it could be difficult or impractical to calculate Lender's actual damages from prepayment for any reason pursuant to this Schedule or the Master Agreement, (ii) the Prepayment Fee is intended to be a fair and reasonable approximation of such damages, and (iii) the Prepayment Fee is not intended to be a penalty. If Borrower remits to Lender any amount in excess of a Payment that is due hereunder, such amount shall be applied to Borrower's obligation to Lender in inverse order of maturity or may be returned to Borrower in Lender's sole discretion but no such action shall entitle Borrower to cease making any Payment as otherwise scheduled herein. Upon execution hereof, Borrower further agrees to pay the Documentation Fee to Lender. BORROWER AGREES THAT THIS SCHEDULE AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN BORROWER AND LENDER.

Equipment Finance Schedule                 Page 1 of 2

DocuSign Envelope ID: CE10B0B2-0D19-4CAD-845D-19B05E11C4DF

## EQUIPMENT FINANCE SCHEDULE

Equipment Finance Schedule No. ██3401 dated **August 10, 2023** ("Schedule") to
Master Equipment Finance Agreement dated **August 10, 2023**
Between Crossroads Equipment Lease and Finance, LLC ("Lender") and
**Zero Max Construction Inc**
("Borrower")

**IN WITNESS WHEREOF**, the parties have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

| **Lender** | **Borrower** |
|---|---|
| **Crossroads Equipment Lease and Finance, LLC**<br>a California Limited Liability Company | **Zero Max Construction Inc**<br>a Pennsylvania Corporation |
| By: *Latisha Lowe*<br>━━84C534E85EEF448... | By: ━━8ABE71D12297479... |
| Printed<br>Name: Latisha Lowe | Name: Saydullo Askaralievich Usmonov |
| Title: Documentation & Funding Specialist | Title: President |

Co-Borrower: _____

By: _____

Name: _____

Title: _____

In Process

Equipment Finance Schedule                    Page 2 of 2

Equipment Finance Schedule No. ▆3401 Dated: **August 10, 2023** ("Agreement") between Crossroads Equipment Lease & Finance, LLC ("Lender") and **Zero Max Construction Inc** ("Borrower") to Master Equipment Finance Agreement Dated: **August 10, 2023**

I, acting on behalf of Borrower, acknowledge that I have personally inspected or caused to be personally inspected to my satisfaction all items of Equipment described in the above Agreement and that I am duly authorized on behalf of the Borrower to sign and bind the Borrower to the Agreement. Capitalized terms used herein shall have the meanings assigned to them in the Agreement, except, as the context shall require

The Equipment has been received, inspected and installed to Borrower's satisfaction and is complete, operational and in good condition and working order and satisfactory in all respects and conforms to all specifications in the Agreement and the supply contract or other agreement with the Supplier.

Borrower hereby accepts the Equipment. Borrower further acknowledges that this Agreement is NON-CANCELLABLE, ABSOLUTE AND IRREVOCABLE. Borrower certifies that no Event of Default or event that with notice of lapse of time would become a Default currently exists.

Borrower:    Zero Max Construction Inc

By: _____

Printed Name:    Saydullo Askaralievich Usmonov

Title:    President

Co-Borrower: _____

By: _____

Printed Name: _____

Title: _____

Accepted by Lender:

**Crossroads Equipment Lease and Finance, LLC**

_____

Its: _____

Commencement Date: _____

Acceptance Certificate (EFA)
03042019

Page 1 of 1

# COMMONWEALTH OF PENNSYLVANIA

## CERTIFICATE OF TITLE FOR A VEHICLE

169

FUEL: DIESEL

Bepo

2417699990016610-001

| 3AKJHHDR3RSVB3218 | 2024 | FREIGHTLINER | 86370901001 ZE |
|---|---|---|---|
| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE OF VEHICLE | TITLE NUMBER |

| TT | 0 | | OR | 9/15/23 | 000000 | 0 |
|---|---|---|---|---|---|---|
| BODY TYPE | DUP | SEAT CAP | PRIOR TITLE STATE | ODOM. PROCD. DATE | ODOM. MILES | ODOM. STATUS |

| 9/15/23 | 9/15/23 | 18,115 | | 80,000 | |
|---|---|---|---|---|---|
| DATE PA TITLED | DATE OF ISSUE | UNLADEN WEIGHT | GVWR | GCWR | TITLE BRANDS |

ODOMETER STATUS

0 = ACTUAL MILEAGE
1 = MILEAGE EXCEEDS THE MECHANICAL LIMITS
2 = NOT THE ACTUAL MILEAGE
3 = NOT THE ACTUAL MILEAGE-ODOMETER TAMPERING VERIFIED
4 = EXEMPT FROM ODOMETER DISCLOSURE

TITLE BRANDS

A = ANTIQUE VEHICLE
C = CLASSIC VEHICLE
D = COLLECTIBLE VEHICLE
F = OUT OF COUNTRY
G = ORIGINALLY MFGD. FOR NON-U.S. DISTRIBUTION
H = AGRICULTURAL VEHICLE
L = LOGGING VEHICLE
P = IS/WAS A POLICE VEHICLE
R = RECONSTRUCTED
S = STREET ROD
T = RECOVERED THEFT VEHICLE
V = VEHICLE CONTAINS REISSUED VIN
W = FLOOD VEHICLE
X = IS/WAS A TAXI

REGISTERED OWNER(S)

ZERO MAX CONSTRUCTION INC
9906 BUSTLETON AVE
PHILADELPHIA PA 19115

FIRST LIEN FAVOR OF:

CROSSROADS
EQUIPMENTLEASE &

FIRST LIEN RELEASED_____ DATE

BY_____ AUTHORIZED REPRESENTATIVE

MAILING ADDRESS

CROSSROADS
EQUIPMENTLEASE &
FINANCE LLC
9385 HAVEN AVE
RANCHO CUCAMON CA 91730

SECOND LIEN FAVOR OF:

If a second lienholder is listed upon satisfaction of the first lien, the first lienholder must forward this Certificate of Title to the Bureau of Motor Vehicles with the appropriate form and fee.

SECOND LIEN RELEASED _____ DATE

BY_____ AUTHORIZED REPRESENTATIVE

## pennsylvania
DEPARTMENT OF TRANSPORTATION

I certify as of the date of issue, the official records of the Pennsylvania Department of Transportation reflect that the person(s) or company named herein is the lawful owner of the said vehicle.

MICHAEL B. CARROLL

Secretary of Transportation

### D. APPLICATION FOR TITLE AND LIEN INFORMATION

SUBSCRIBED AND SWORN TO BEFORE ME:

MO      DAY      YEAR

SIGNATURE OF PERSON ADMINISTERING OATH

SIGN IN PRESENCE OF A NOTARY

STAMP OR SEAL

The undersigned hereby makes application for Certificate of Title to the vehicle described above, subject to the encumbrances and other legal claims set forth here.

SIGNATURE OF APPLICANT OR AUTHORIZED SIGNER

SIGNATURE OF CO-APPLICANT/TITLE OF AUTHORIZED SIGNER

TO BE COMPLETED BY PURCHASER WHEN VEHICLE IS SOLD AND THE APPROPRIATE SECTIONS ON THE REVERSE SIDE OF THIS DOCUMENT ARE COMPLETED.

If a co-purchaser other than your spouse is listed and you want the title to be listed as "Joint Tenants With Right of Survivorship" (on death of one owner, title goes to surviving owner) CHECK HERE ☐. Otherwise, the title will be issued as "Tenants in Common" (on death of one owner, interest of deceased owner goes to his/her heirs or estate).

IF NO LIEN, CHECK ☐   IS THIS AN ELT? (IF YES, FIN REQUIRED)   YES ☐ NO ☐

1ST LIENHOLDER FINANCIAL INSTITUTION NUMBER:

1ST LIENHOLDER NAME

STREET

| CITY | STATE | ZIP |
|---|---|---|

IF NO 2ND LIEN, CHECK ☐ IS THIS AN ELT? (IF YES, FIN REQUIRED) YES ☐ NO ☐

2ND LIENHOLDER FINANCIAL INSTITUTION NUMBER:

2ND LIENHOLDER NAME

STREET

| CITY | STATE | ZIP |
|---|---|---|

**STORE IN A SAFE PLACE - IF LOST APPLY FOR A DUPLICATE - ANY ALTERATION OR ERASURE VOIDS THIS TITLE**

(TYPE OR PRINT) Certificate of Title must be submitted within 20 days, unless the purchaser is a registered dealer holding the vehicle for resale.

**WARNING** - TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES OR IMPRISONMENT.

**A. ASSIGNMENT OF TITLE** - Registered dealers must complete Forms MV-27A or MV-27B as required by law. If purchaser is NOT a registered dealer, Section D on the front of this form must be completed.

I/We certify, to the best of my/our knowledge that the odometer reading is

TENTHS

_____ , _____ ✕ miles and reflects the actual mileage of the vehicle,

unless one of the following boxes is checked:

☐ Reflects the amount of mileage in excess of its mechanical limits

☐ Is NOT the actual mileage WARNING: Odometer discrepancy

I/We further certify that the vehicle is free of any encumbrance and that the ownership is hereby transferred to the person(s) or the dealer listed.

SUBSCRIBED AND SWORN TO BEFORE ME:

MO.   DAY   YEAR

SIGNATURE OF PERSON ADMINISTERING OATH

STAMP OR SEAL

LAST   FIRST   MIDDLE NAME

PURCHASER OR FULL BUSINESS NAME

CO-PURCHASER

STREET ADDRESS

CITY

STATE   ZIP   PURCHASE PRICE OR DIN

PURCHASER SIGNATURE

CO-PURCHASER SIGNATURE

PURCHASER AND/OR CO-PURCHASER MUST *HANDPRINT* NAME HERE

SIGNATURE OF SELLER

SIGNATURE OF CO-SELLER

SELLER AND/OR CO-SELLER MUST *HANDPRINT* NAME HERE

**B. RE-ASSIGNMENT OF TITLE BY REGISTERED DEALER**   If purchaser listed in Block A is NOT a registered dealer Section D on the front of this form must be completed.

I/We certify, to the best of my/our knowledge that the odometer reading is

TENTHS

_____ , _____ ✕ miles and reflects the actual mileage of the vehicle,

unless one of the following boxes is checked:

☐ Reflects the amount of mileage in excess of its mechanical limits

☐ Is NOT the actual mileage WARNING: Odometer discrepancy

I/We further certify that the vehicle is free of any encumbrance and that the ownership is hereby transferred to the person(s) or the dealer listed.

SUBSCRIBED AND SWORN TO BEFORE ME:

MO.   DAY   YEAR

SIGNATURE OF PERSON ADMINISTERING OATH

STAMP OR SEAL

LAST   FIRST   MIDDLE NAME

PURCHASER OR FULL BUSINESS NAME

CO-PURCHASER

STREET ADDRESS

CITY

STATE   ZIP   PURCHASE PRICE OR DIN

PURCHASER SIGNATURE

CO-PURCHASER SIGNATURE

PURCHASER AND/OR CO-PURCHASER MUST *HANDPRINT* NAME HERE

SIGNATURE OF SELLER

SELLER MUST *HANDPRINT* NAME HERE

**RE-ASSIGNMENT OF TITLE BY REGISTERED DEALER**   If purchaser is NOT a registered dealer Section D on the front of this form must be completed.

I/We certify, to the best of my/our knowledge that the odometer reading is

TENTHS

_____ , _____ ✕ miles and reflects the actual mileage of the vehicle,

unless one of the following boxes is checked:

☐ Reflects the amount of mileage in excess of its mechanical limits

☐ Is NOT the actual mileage WARNING: Odometer discrepancy

I/We further certify that the vehicle is free of any encumbrance and that the ownership is hereby transferred to the person(s) or the dealer listed.

SUBSCRIBED AND SWORN TO BEFORE ME:

MO.   DAY   YEAR

SIGNATURE OF PERSON ADMINISTERING OATH

STAMP OR SEAL

LAST   FIRST   MIDDLE NAME

PURCHASER OR FULL BUSINESS NAME

CO-PURCHASER

STREET ADDRESS

CITY

STATE   ZIP   PURCHASE PRICE OR DIN

PURCHASER SIGNATURE

CO-PURCHASER SIGNATURE

PURCHASER AND/OR CO-PURCHASER MUST *HANDPRINT* NAME HERE

SIGNATURE OF SELLER

SELLER MUST *HANDPRINT* NAME HERE

**RE-ASSIGNMENT OF TITLE BY REGISTERED DEALER**   If purchaser is NOT a registered dealer Section D on the front of this form must be completed.

I/We certify, to the best of my/our knowledge that the odometer reading is

TENTHS

_____ , _____ ✕ miles and reflects the actual mileage of the vehicle,

unless one of the following boxes is checked:

☐ Reflects the amount of mileage in excess of its mechanical limits

☐ Is NOT the actual mileage WARNING: Odometer discrepancy

I/We further certify that the vehicle is free of any encumbrance and that the ownership is hereby transferred to the person(s) or the dealer listed.

SUBSCRIBED AND SWORN TO BEFORE ME:

MO.   DAY   YEAR

SIGNATURE OF PERSON ADMINISTERING OATH

STAMP OR SEAL

MV-4 (12-2015)

LAST   FIRST   MIDDLE NAME

PURCHASER OR FULL BUSINESS NAME

CO-PURCHASER

STREET ADDRESS

CITY

STATE   ZIP   PURCHASE PRICE OR DIN

PURCHASER SIGNATURE

CO-PURCHASER SIGNATURE

PURCHASER AND/OR CO-PURCHASER MUST *HANDPRINT* NAME HERE

SIGNATURE OF SELLER

SELLER MUST *HANDPRINT* NAME HERE

**C.** ☐ CHECK HERE IF APPLYING FOR A DEALER TITLE AND COMPLETE SECTION D. TITLING FEES $ _____ . _____

An employee of an issuing agent licensed as a vehicle dealer by the Pennsylvania State Board of Vehicle Manufacturers, Dealers and Salespersons may verify a person's signature in lieu of notarization.